NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-0223-25

STATE OF NEW JERSEY,

      Plaintiff-Appellant,

v.

DEXTER L. HUBBARD,

      Defendant-Respondent.

_____

STATE OF NEW JERSEY,

      Plaintiff-Appellant,

v.

GUSTAVO ARENAS,

      Defendant-Respondent.

_____

STATE OF NEW JERSEY,

      Plaintiff-Appellant,

v.

KYANAZIA DOBSON,

      Defendant.

_____

| APPROVED FOR PUBLICATION |
| :---: |
| **August 5, 2026** |
| **APPELLATE DIVISION** |

STATE OF NEW JERSEY,

      Plaintiff-Appellant,

v.

KAHDAR HOLMES,

      Defendant-Respondent.
_____

STATE OF NEW JERSEY,

      Plaintiff-Appellant,

v.

MARCUS MORALES,

      Defendant.
_____

STATE OF NEW JERSEY,

      Plaintiff-Appellant,

v.

JAMAH GOODWIN, a/k/a
JAMARSCU RUSSELL,

      Defendant.
_____

STATE OF NEW JERSEY,

      Plaintiff-Appellant,

v.

JOSEPH PEREZ,

    Defendant-Respondent.

_____

Argued May 6, 2026 – Decided August 5, 2026

Before Judges Currier, Smith and Jablonski.

On appeal from an interlocutory order of the Superior Court of New Jersey, Law Division, Passaic County, Indictment Nos. 25-02-0111, 24-12-0898, 24-02-0071, 23-04-0311, 25-01-0065, 24-12-0864, and 24-09-0678.

Timothy Kerrigan, Chief Assistant Prosecutor, argued the cause for appellant (Camelia M. Valdes, Passaic County Prosecutor, attorney; Timothy Kerrigan and Ali Y. Ozbek, Assistant Prosecutor, of counsel and on the briefs).

Ashley Brooks, Assistant Deputy Public Defender, argued the cause for respondents (Jennifer N. Sellitti, Public Defender, attorney; Ashley Brooks, of counsel and on the briefs).

Christopher A. Dernbach argued the cause for amicus curiae American Civil Liberties Union of New Jersey (Lowenstein Sandler, LLP and American Civil Liberties Union of New Jersey Foundation, attorneys; Alexander R. Shalom, Natalie J. Kraner, Christopher A. Dernbach, Jeanne M. LoCicero, and Ezra D. Rosenberg, on the brief).

Daniel I. Bornstein, Deputy Attorney General, argued the cause for amicus curiae Office of the Attorney General (Jennifer Davenport, Attorney General, attorney; Michael L. Zuckerman, Deputy Solicitor General, Benjamin M. Shultz, Assistant Attorney General, and Daniel I. Bornstein, of counsel and on

the brief; Bassam F. Gergi, Deputy Attorney General, on the brief).

The opinion of the court was delivered by

JABLONSKI, J.A.D.

This appeal requires us to determine, as an issue of first impression, whether a county prosecutor must disclose substantive details about a police department's pending internal affairs ("IA") investigation to a defendant in a criminal case in which the investigating officer was involved before that investigation is completed.

By leave granted, the State appealed the trial court's order requiring it to release substantive information about pending IA investigations of officers to defense counsel, and vacating protective orders accompanying the disclosure letters the State sent to defendants as required by Giglio v. United States, 405 U.S. 150, 154 (1972), and the Off. of the Att'y Gen., Law Enf't Directive No. 2019-6, Directive Establishing County Policies to Comply with Brady v. Maryland and Giglio v. United States (Dec. 4, 2019) (the "Directive").  Those letters summarily notified defense counsel that an officer involved in the case was the subject of an "allegation of misconduct that bears upon [that officer's] truthfulness, bias, or integrity . . . ."

We conclude the motion court mistakenly exercised its discretion by requiring disclosure of this confidential information while the IA

investigations were pending. Therefore, we reverse those orders. However, because we agree with the trial court's determination to vacate the protective orders as being overly broad, we affirm those orders.

I.

In 2019, Attorney General Gurbir S. Grewal issued Directive No. 2019-6 to address and to standardize the affirmative obligation of county prosecutors to disclose exculpatory and impeachment evidence to defense counsel as required by Giglio, Brady v. Maryland, 373 U.S. 83 (1963), and State v. Carter, 91 N.J. 86 (1982). Each county prosecutor was required to implement local policies to comply with the Directive and to use a "non-exhaustive list of potential Giglio material as it relates to civilian and investigative State witnesses" when considering what specific information should be disclosed. Law Enf't Directive No. 2019-6, at 4. The Directive also explicitly noted this material, regardless of category, "does not necessarily mean the information will be disclosed." Ibid.

The categories included "sustained" findings of evidence of an "investigative employee's" dishonesty, false reporting, criminal charges or convictions, intentional mishandling of evidence, or bias. Id. at 4-6. The Directive also specifically noted disclosure must be made as to "[a]ny

allegation of misconduct bearing upon truthfulness, bias, or integrity that is the subject of a pending investigation." Id. at 5.

In its written guidelines essentially mirroring the Attorney General's directive, the Passaic County Prosecutor's Office ("PCPO") implemented a policy requiring

> [d]isclosure of confidential Giglio material should only be done under [a] protective order. Examples of confidential Giglio material include: 1) when there is an allegation of misconduct against an officer that bears upon truthfulness, bias, or integrity that is the subject of a pending investigation or 2) when there is a sustained finding as to candor against an officer that is not publicly reported. To obtain a protective order, the Assistant [P]rosecutor must make an ex parte application to the court under R[ule] 3:13-3(e). This application must include both a statement to the court and a proposed form or order.
>
> [Passaic Cnty. Prosecutor's Off., Policy and Procedures to Comply with Brady v. Maryland and Giglio v. United States 7 (rev. 2025) (emphasis in original).]

To establish "a comprehensive process to address complaints of police misconduct," the Attorney General issued the Attorney General's Internal Affairs Policy and Procedures manual ("IAPP"). Rivera v. Union Cnty. Prosecutor's Off., 250 N.J. 124, 142 (2022). Under the IAPP, "[t]he nature and source of internal allegations, the progress of [IA] investigations, and the

resulting materials are [designated as] confidential information . . . ."[1]  IAPP § 9.6.1.

In this consolidated appeal, seven defendants[2] were separately indicted by a Passaic County Grand jury for various crimes.  Each defendant, through counsel, received correspondence, termed a Giglio letter, from the PCPO notifying them that specified officers of the Paterson Police Department, who might testify at trial, were accused of "misconduct that bears upon [the officer's] truthfulness, bias, or integrity that is the subject of a pending investigation."

A protective order accompanied that letter, granted ex parte under Rule 3:13-3(e)(1) and (2) by various judges to whom these cases were assigned.  Under those orders, defendants' counsel were limited to discussing the information contained in the letter only with counsel's client.  Third parties, even within counsels' offices, were not permitted to have this information.

Arguing the State's "bare bones" notification of the pending investigation hampered their ability to prepare for their trials, each defendant

---

[1]  Both the Directive and the IAPP carry the "force of law for State and local law enforcement."  State v. Higgs, 253 N.J. 333, 356 (2023) (quoting In re. Att'y Gen. Law Enf't Directive Nos. 2020-5 & 2020-6, 246 N.J. 462, 487-88 (2021)).

[2]  After oral argument in this appeal, the PCPO notified us that four of the seven defendants resolved their pending matters.

A-0223-25

moved to compel the State to "produce the underlying materials related to the allegation and the investigation of [the reported] misconduct." They also asked the motion court to vacate or to amend the protective order to expand the scope of those who could view the produced IA information.

Separately, one defendant, Kahdar Holmes, moved under the protocol established by our Supreme Court in Higgs,[3] for an in camera review of "any open internal affairs complaints and their investigations" pertaining to the officer involved in Holmes's arrest. The same motion judge granted the application and ordered a "complete copy" of the officer's file to be submitted to the court for an in camera review. Consequently, Holmes's counsel was able to obtain a "significant number" of IA files pertaining to that officer under the protective order. The remaining defendants in this appeal did not take this additional step.

In a written opinion, the motion court granted defendants' motion to compel disclosure of the IA investigations and vacated each protective order. Recognizing the convergence of significant policy concerns at the "intersection of public safety, transparency, due process, and the evolving standards of criminal justice practice" this matter triggered, the motion judge framed the controversy by identifying two central issues: (1) "whether the State's current

---

[3] 253 N.J. at 357-59.

practice of providing [defendants] with only . . . generic notification[s] of . . . pending [IA] investigation[s] satisfies [its] disclosure obligations" under Giglio; and (2) "whether the protective order imposed [was] procedurally and substantively deficient."

Addressing the first inquiry, the motion court characterized the PCPO's Giglio letter as a "template" containing only basic biographic information and notification of a pending IA investigation concerning the officers' "truthfulness, bias, or integrity" without specifying the nature of the allegations, or providing any details. The court recognized no sustained findings had taken place nor had any disciplinary dispositions been reached as of the motion argument date. The court also acknowledged the State's representation that it would provide full and detailed disclosure, including supporting evidence, if the IA investigation resulted in a sustained finding.

The court interpreted the Directive to require any allegation of misconduct relating to truthfulness, bias, or integrity that was the subject of a pending investigation constituted Giglio material and required release of any materials relating to those accusations to defendants, regardless of the status of IA's investigation. The court substantiated its conclusion by finding the letter offered "no usable facts" and did not identify either the nature nor the context of the alleged misconduct. This, it found, deprived defendants of opportunities

9

to assess the relevance of the information for investigation, to prepare for cross-examination, or to intelligently begin plea negotiations.

The motion court also found the protective order accompanying each Giglio letter was "categorical and overbroad." Holding the "[S]tate's generalized confidentiality and reputational interests [were] not enough to override the defendants' due process rights and the constitutional imperative for open discovery," the motion court found the order to be "excessively broad" and the restrictions it created could not be justified without a specific showing of harm.

We granted the State leave to appeal and it raises these issues for our consideration:

> Point I
>
> The substance of pending [IA] investigations are confidential and should not be subject to automatic discovery provisions.
>
> A. There is no legal basis to support [the motion court]'s decision.
>
> B. [The motion court]'s decision unduly disregarded the risk of labeling as a "Giglio" officer.
>
> C. The existing PCPO process works in compliance with constitutional and ethical requirements.
>
> D. A rational analysis of Directive 2019-6 stands firmly against [the motion court]'s reasoning.

E. [The motion court]'s decision is at odds with recent caselaw.

Point II

The protective orders entered by four different Superior Court Judges were appropriately tailored to prevent unnecessary disclosure of confidential information.

Point III

The State's concerns about the stigma of being a "Giglio" officer are well-founded.

Point IV

[The motion court]'s ruling creates an unworkable discovery process.

Amicus the New Jersey Attorney General supports the PCPO's position, and maintains there was no basis for the discovery of pending IA investigations, and that neither the Attorney General's Directive nor existing precedent require disclosure before any allegations were substantiated.

Defendants argued evidence from ongoing IA investigations related to an officer's truthfulness, bias, or integrity definitionally qualifies as impeachment evidence and, therefore, must be disclosed under Giglio even before the IA investigation was concluded. They assert the motion court correctly vacated the protective orders since they were overly broad and infringed on defendants' preparatory and due process rights.

11

In support of this position, the American Civil Liberties Union ("ACLU"), as amicus, argues defendants' rights established in Brady and Giglio set a constitutional minimum that could neither be diminished nor restricted by state law. Without additional details, the ACLU contends the PCPO's Giglio letter was constitutionally infirm, and the protective order's prohibition on sharing information within the Office of the Public Defender ("OPD") was too broad and improperly discriminated against the OPD as compared to private law firms.

II.

We defer to a trial court's decision related to pre-trial discovery and will reverse it only if we conclude the court mistakenly exercised its discretion. State v. Ramirez, 252 N.J. 277, 298 (2022). We also apply this standard to a "trial court's ruling on a motion for disclosure of privileged or confidential records . . . ." N.J. Div. of Child. Prot. & Perm. v. M.C., 456 N.J. Super. 568, 585 (App. Div. 2018). A court exercises its discretion incorrectly if it decides a matter "without a rational explanation, inexplicably depart[s] from established policies, or [rests the issue] on an impermissible basis." State v. R.Y., 242 N.J. 48, 65 (2020).

"Whether evidence is material and . . . subject to disclosure under the Brady rule is a mixed question of law and fact." State v. Marshall, 148 N.J.

89, 185 (1997). We defer to the factual findings of the court, provided they are substantiated by the record. State v. Pierre, 223 N.J. 560, 577 (2015) (quoting State v. Harris, 181 N.J. 391, 416 (2004)). Our review of a trial court's application of the Brady rule, however, is de novo. Marshall, 148 N.J. at 185.

A.

The State argues the trial court misapplied its discretion by ordering disclosure of the IA files before the underlying investigation was completed, without considering or properly balancing defendants' right to discovery against the State's confidentiality concerns. We agree.

These jurisprudential principles are fundamental and govern our analysis. Criminal defendants are afforded "broad" pre-trial discovery to "guarantee fair and just trials and promote the search for truth . . . ." State v. Morgan, 479 N.J. Super. 420, 429 (App. Div. 2024) (citing State v. Scoles, 214 N.J. 236, 251-52 (2013)). The tenor of our Court Rules reflects these tenets and, therefore, requires "an open-file approach to pretrial discovery in criminal matters post-indictment." Scoles, 214 N.J. at 252. The right to obtain discovery is not unfettered and there are limits to defendants' "automatic right to broad discovery to keep the process from 'transform[ing] . . . into an unfocused, haphazard search for evidence.'" Morgan, 479 N.J. Super. at 429

13

(alteration and omission in original) (quoting State v. Arteaga, 476 N.J. Super. 36, 53 (App. Div. 2023)).

Rule 3:13-3(b)(1) sets forth the State's obligations to provide both exculpatory and impeachment evidence to defendants and codifies the principles set forth by the United States Supreme Court in Brady and Giglio. Higgs, 253 N.J. at 354-55.  The Brady rule is clear:  "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or . . . punishment, irrespective of the good faith or bad faith of the prosecution."  Brady, 373 U.S. at 87.

The Court expanded this principle in Giglio, concluding "[w]hen the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within this general rule."  Giglio, 405 U.S. at 154 (quoting Napue v. Illinois, 360 U.S. 264, 269 (1959)) (internal quotation marks omitted).  Our Supreme Court advanced this doctrine, concluding "the State's obligation to disclose is 'not limited to evidence that affirmatively tends to establish a defendant's innocence but would also include any information material and favorable to a defendant's cause even where the evidence concerns only the credibility of a State's witness.'"  State v. Carter, 91 N.J. 86, 111 (1982) (quoting State v. Carter, 69

14

N.J. 420, 433 (1976)). Both the release of impeachment evidence and exculpatory material is encompassed by <u>Brady</u>'s scope. <u>State v. Hyppolite</u>, 236 N.J. 154, 165 (2018). Prosecutors possess a special obligation to share impeachment evidence within the prosecutor's control. <u>State v. Nash</u>, 212 N.J. 518, 544 (2013) (citing <u>Strickler v. Greene</u>, 527 U.S. 263, 280 (1999)).

All aspects of IA investigations are confidential, including, specifically, "the progress of . . . [the] investigations" and "the resulting materials." IAPP § 9.6.1. Often, unsubstantiated findings, rumors, conjecture, and speculation form the basis of referrals, which an IA investigator must, nevertheless, accept and evaluate regardless of their merit. As argued by the PCPO and its amicus, premature disclosure of unsubstantiated allegations and the consequent revelation of witness identities during an IA investigation can damage reputations, hinder investigations, compromise disciplinary processes, unfairly harm officers, and potentially expose complainants to negative consequences.

Conversely, recent New Jersey jurisprudence has underscored the critical importance of transparency in law enforcement activities. <u>See</u> <u>Rivera</u>, 250 N.J. at 147 ("In general, the public has an interest in the disclosure of internal affairs reports in order to hold officers accountable, to deter misconduct, to assess whether the internal affairs process is working properly, and to foster trust in law enforcement."). Since the credibility of any testifying witness is a

A-0223-25

fundamental underpinning of the criminal trial process, the ability to obtain this critical information is important to preserve defendants' right to a fair trial and to build an effective defense as part of it.  See State v. Chambers, 252 N.J. 561, 582 (2023) (noting that lack of "'access to the raw materials integral to the building of an effective defense' is fundamentally unfair") (quoting State in Int. of A.B., 219 N.J. 542, 556 (2014)).

The tension created between these two principles requires careful consideration of both parties' positions and must result in a balanced approach that satisfies both objectives.

Our Supreme Court addressed this issue in Higgs, 253 N.J. at 333. Higgs was involved in a shooting with a police officer and sought the release of the involved officer's IA file that included prior incidents of the officer firing his weapon while on duty.  Id. at 340.  The Court, after reviewing the pertinent jurisprudence regarding the disclosure of evidence, concluded defendants "must be allowed, under certain circumstances, to access documents in [the officer's IA] files."  Id. at 357.  "This is consistent with the State's obligation to produce exculpatory and impeachment evidence . . . ." Ibid.  However, this entitlement does not mean that "defendants should have unbridled access to [IA] records."  Id. at 357-58.

"To appropriately balance the important interests involved," the Court developed the following procedure to permit defendants to obtain access to confidential information contained in IA files:

> [A] defendant who seeks discovery of information from an [IA] file must first file a motion with the trial court requesting an in camera review of that file. The motion shall identify the specific category of information the defendant seeks and the relevance of that information to the defendant's case. A general allegation that the defendant is in search of information relevant to a law enforcement officer's credibility for impeachment purposes would be insufficient to obtain review of the file. The procedure should not be a fishing expedition into the disciplinary records of law enforcement.
>
> [Id. at 358.]

If a trial court determines the requested information in the IA file is relevant, for whatever purpose, including impeachment, the court "shall grant the defendant's motion and conduct an in camera review of the [IA] records outside the presence of the parties." Id. at 359. The review would be "solely for the purpose of determining whether the category of identified information exists in the [IA] file." Ibid. (emphasis in original). Then, if "the trial court determines that the requested information is present in the file, both parties shall be allowed to review the relevant portion of the file, subject to any protective orders entered by the trial court." Ibid. (emphasis omitted). This

17

would, of course, all be subject to an ultimate determination that the evidence is admissible at trial as relevant. Id. at 359-60.

We acknowledge the factual predicate in Higgs differs from that in the present case. In Higgs, the requested disclosure pertained to fact-specific evidence regarding prior shooting incidents. 253 N.J. at 340. Here, the issue involves the disclosure of circumstances that led to the designation of IA files as relevant to an officer's "truthfulness, bias, or integrity." Nonetheless, the rule and the balancing test established in Higgs is equally applicable here and permits a trial court to weigh the need to protect the confidentiality and integrity of the IA investigation process against defendants' right to obtain this information, provided they make a proper showing.[4]

This approach is the most reasonable and equitable and aligns with common sense. Premature disclosure of unsubstantiated information undermines the trial's truth-finding function. It similarly creates significant challenges for the fact-finder, whose responsibility is to determine the truth, especially if they are presented with a range of incidents or referrals that may not have been proven, particularly when these are introduced solely to question a witness's credibility. This is particularly true since the Directive explicitly

---

[4] The approach we adopt applies only when the IA investigation into the subject officer's conduct remains open. If the allegations are substantiated, no balancing test is necessary, since the State acknowledges its obligation to release the material according to the Directive and Giglio.

states that "[a]llegations that cannot be sustained, are not credible, or have resulted in the exoneration of an employee, including where the previous Giglio finding has either been vacated, or overturned on the merits in any subsequent action, generally are not considered to be potential impeachment information . . . ." Law Enf't Directive No. 2019-6, at 3. On balance, this approach preserves the integrity of the IA investigative process while simultaneously safeguarding the due process rights of all parties involved. Therefore, we reverse the orders compelling disclosure of the IA materials before the investigation is concluded and any allegations are substantiated.

B.

We turn to the protective orders the motion court vacated when it ordered the release of materials related to the pending IA investigation. The State contends the various protective orders were appropriately tailored to prevent the unnecessary disclosure of confidential information. We disagree.

We agree with the court's reasoning to vacate the protective orders as overly broad, particularly the prohibition on defense counsel discussing or sharing the evidence with other OPD employees and experts. However, in light of our conclusions regarding the Giglio letters, since the consideration of pre-substantiated IA materials will be addressed on a case-specific basis through motion practice, any concerns regarding improper or proper use can be

19

specifically addressed by the motion court under a factually-tailored protective order. Defense counsel will have the opportunity to be heard regarding the scope of the release of the <u>Giglio</u> material, and the trial court will determine whether the proposed use is appropriate. Consequently, the court can fashion an order with detailed and precise safeguards to mitigate or eliminate the risk of improper disclosure of sensitive information. Therefore, we affirm the orders vacating the protective orders.

In sum, given the competing confidentiality and due process concerns present in this nuanced matter, we conclude a case-by-case approach is necessary to balance these legitimate and reasonable interests.

To the extent we have not specifically addressed the parties' remaining arguments, we conclude they lack sufficient merit to warrant discussion in a written opinion. <u>R.</u> 2:11-3(e)(2).

Reversed in part and vacated in part. The parties may make appropriate applications in accordance with this opinion upon remand to the trial court. We do not retain jurisdiction.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M. C. Hanley

Clerk of the Appellate Division